## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

WALGREEN COMPANY,

     Plaintiff,

v.

PANASONIC HEALTHCARE
CORPORATION OF NORTH
AMERICA,

     Defendant/Third-Party Plaintiff,

v.

COMM-WORKS, LLC,

     Third-Party Defendant.

No. 17-cv-02120

Judge John F. Kness

### MEMORANDUM OPINION AND ORDER

Plaintiff Walgreen Company (which refers to itself in its briefing as "Walgreens") contracted with Defendant Panasonic Healthcare Corporation of North America ("Panasonic") to install an alarm system for its refrigerated drug storage facility in Beaverton, Oregon. The alarm system is supposed to alert Walgreens if the temperature in the refrigerated facility deviates from the proper range to safely store pharmaceuticals. Panasonic, with the approval of Walgreens, subcontracted the installation work to Comm-Works, LLC ("Comm-Works"). Comm-Works frequently works for Walgreens both as a contractor and sub-contractor. In June 2016, Walgreens' cooler failed, and the temperature rose above the alarm-triggering threshold, but Walgreens did not receive an alarm. Many of the specialty pharmaceuticals in the facility were destroyed.

Walgreens sued Panasonic, alleging that Panasonic is responsible for the alarm's failure. Walgreens brings three counts against Panasonic for breach of contract (Count I), negligence (Count II), and breach of warranty (Count III). Panasonic filed a third-party complaint against Comm-Works seeking contractual indemnification for liability and the cost of defense (Third-Party Count I), contribution (Third-Party Count II), and implied indemnification (Third-Party Count III). Judge Dow, to whom this case was previously assigned, granted with prejudice Comm-Works' motion to dismiss Panasonic's implied indemnification claim. (Dkt. 80.)

Before the Court now are Panasonic's motion for summary judgment against Walgreens (Dkt. 124) and cross-motions for summary judgment brought by Comm-Works (Dkt. 113) and Panasonic (Dkt. 119). For the reasons stated below, the Court grants summary judgment to Panasonic against Walgreens on all claims. Additionally, the Court grants partial summary judgment to Panasonic against Comm-Works on Panasonic's contractual indemnification claim because Comm-Works had a duty to defend Panasonic in Walgreens' suit. Panasonic's remaining claims are dismissed as moot.

## I.    FACTUAL BACKGROUND

### A.    The Parties

Walgreens operates retail pharmacies nationwide and a select number of specialty pharmacies that store certain high-value pharmaceuticals. (Dkt. 141 ¶ 1.) Panasonic sells products used in the life science and biomedical industries, including a temperature monitoring system called the "LabAlert System." (*Id.* ¶ 2.) In April

2015, Walgreens and Panasonic entered a Hosted Services and License Agreement (the "HSA") for Panasonic to provide Walgreens with LabAlert systems, implementation, training, and support services for Walgreens' specialty pharmacies, including the one in Beaverton, Oregon (the "Beaverton Facility"). (*Id.* ¶ 3.) Panasonic hired Comm-Works to install LabAlert at Walgreens facilities, including the Beaverton Facility, and Panasonic and Comm-Works entered a Master Terms and Conditions Agreement (the "Comm-Works Contract") governing the work. (Dkt. 115 ¶ 16.) Panasonic hired Comm-Works at Walgreens' recommendation, as Comm-Works was a Walgreens-approved vendor that had installed security systems at Walgreens locations across the country for over a decade. (Dkt. 162 ¶¶ 29–31.)

**B.     Overview of the LabAlert System**

The LabAlert System continuously monitors and records the temperature of assets, such as pharmaceutical coolers, via wireless sensors that send data to the system's central hardware component called the "Gateway." Each sensor is either "enabled" if connected to an asset, or "bypassed" if not connected to an asset. (*Id.* ¶ 11.) If a sensor is configured in the Gateway as enabled but is not connected to an asset, the Gateway generates an "open sensor fault" alert. (*Id.* ¶ 12.) The Gateway also generates an alert when an asset, measured by the sensor, experiences a "triggering condition," such as when the asset's temperature exceeds the temperature range specified by the user ("temperature excursion"). (*Id.* ¶ 14.)

For the Gateway to generate alarms, it must be configured with desired parameters, such as temperature thresholds, and those parameters must be saved to the Gateway's memory. (Dkt. 115 ¶ 10.) The Gateway has both volatile (temporary)

and non-volatile (permanent) memory. (*Id.*) Parameters saved in volatile memory control the system's alert generation. When the system loses power or otherwise resets, the Gateway defaults to the last parameters saved to non-volatile memory. (*Id.* ¶ 11.) So, if a parameter is saved only in volatile memory, that parameter will be erased if the system resets. Alarm parameters thus must be double-saved to both volatile and non-volatile memory to become permanent. (*Id.* ¶ 12.)

End users like Walgreens are notified of the Gateway's alerts in two ways. First, the Gateway communicates alerts to LabAlert's cloud-based software, FusionLive. (*Id.* ¶ 10.) FusionLive then generates a ticket that provides asset-specific information about the condition causing the alert (*e.g.*, Cooler 1 – Temperature Exceeded). (*Id.* ¶ 14.) Second, the Gateway can be integrated with the end-user's separate, on-site alarm panel that generates alerts in the user's internal security system.

At the Beaverton Facility, the Gateway was connected to the facility's on-site Bosch alarm panel ("Bosch Panel") that communicates alerts to Walgreens' Security Operations Center ("SOC"), the central monitoring station for Walgreens' asset protection systems nationwide. (*Id.* ¶¶ 15, 17.) The SOC receives alerts from the Bosch Panel in software known as MASterMind. But unlike the alerts in FusionLive, the alerts sent to the SOC in MASterMind are "undifferentiated," meaning the alert does not indicate whether it was caused by a triggering condition, such as a temperature excursion, or some other, non-emergent problem such as an open sensor

4

fault. (*Id.* ¶¶ 15, 24, 25; Dkt. 162 ¶ 12.).[1] Walgreens' employees at the SOC are required to login to FusionLive to determine the cause of the alarm.

### C. LabAlert Installation at the Beaverton Facility

On January 15, 2016, Walgreens issued Panasonic a purchase order under the HSA for a LabAlert System at the Beaverton Facility. (Dkt. 115 ¶ 24.) Panasonic in turn sent Comm-Works a work order under the Comm-Works Contract to perform the installation. (*Id.* ¶ 25.) Panasonic's work order required Comm-Works to install the LabAlert Gateway and connect it to the SOC's network, but it did not require Comm-Works to program the Gateway or remove the existing temperature monitoring system called the Winland System. (*Id.* ¶¶ 24, 26.) Comm-Works in turn subcontracted installation of LabAlert to CCV Technology LLC ("CCV"), Comm-Works' authorized installer that was a vetted security vendor for Walgreens. (Dkt. 162 ¶ 33.) Although CCV was vetted, CCV had never installed a LabAlert System. (*Id.*) Comm-Works' work order to CCV was identical in scope to Panasonic's work order to Comm-Works. (Dkt. 115 ¶ 28.)

From late January to early February 2016, CCV installed the LabAlert System at the Beaverton Facility. (Dkt. 162 ¶ 34.) On February 4, Walgreens' on-site property manager, Darrell McGee, signed a form acknowledging that installation of LabAlert was completed and that the system had been integrated with Walgreens' internal security system, MASterMind, and was running and fully visible through FusionLive.

---

[1] LabAlert can also send real time email and text alerts with asset-specific information about the condition causing the alert. (Dkt. 115 ¶ 15; Dkt. 162,¶ 16.) But Walgreens elected not to use this feature at the SOC prior to June 8, 2016. (*Id.*)

(Dkt. 115 ¶¶ 30–31.) On February 10 and again on February 22, the program manager for Walgreens, Fernando Hinojosa, also confirmed that the LabAlert system was installed and communicating with the SOC. (Dkt. 162 ¶ 35.) After Walgreens accepted LabAlert's installation at the Beaverton Facility, Panasonic, Comm-Works, and CCV no longer had access to the Gateway. (*Id.* ¶ 38.)

Walgreens later contacted Comm-Works directly, without Panasonic's knowledge, and requested that a technician return to the Beaverton Facility to disconnect the old temperature monitoring system (the Winland System), replace it with the Bosch Panel, and to again test whether the LabAlert System was communicating with the SOC through the newly-installed Bosch Panel. (*Id.* ¶¶ 39–40.) Comm-Works issued a new work order to CCV for this additional work, and on April 27, 2016, a CCV technician returned to the Beaverton Facility to install the Bosch Panel. (*Id.* ¶ 40.) Unlike the previous work order for the initial installation of LabAlert, Walgreens, not Panasonic, was Comm-Works' customer and Comm-Works invoiced Walgreens directly. (Dkt. 115 ¶ 45.)

### D.    SOC Alert Protocols

Goran Momirovic, a program manager in Walgreens' security unit, developed protocols for SOC to follow in the event of an alert. Upon receipt of an undifferentiated alert in the SOC's MASterMind software, SOC personnel were to login to FusionLive to determine the cause of the alarm and to contact Walgreens employees at the Beaverton Facility to troubleshoot the alarm. (*Id.* ¶ 47.) If FusionLive showed all coolers in a normal temperature range and the SOC could not identify the reason for the alert, and the SOC did not receive a "restoral" (a signal indicating that the

condition causing the alert has been resolved and that the Gateway is back in a non-alert state), then SOC personnel were to escalate the alert to Momirovic for additional troubleshooting. (*Id.* ¶ 48.) SOC personnel were not to full clear an alert, which permanently deletes the alert from MASterMind, until the condition causing the alert had been resolved and SOC received a restoral. (*Id.* ¶ 49.) If an alarm was full cleared without a restoral, then the Gateway would remain in an alarm state, meaning no new alarms would be sent to the SOC in MASterMind even if a temperature excursion were to occur. (*Id.* ¶ 63.) The LabAlert System, however, would still generate temperature excursion tickets in FusionLive. (*Id.*)

### E.    Destruction of Specialty Pharmaceuticals on June 8, 2016

On May 2, 2016, Momirovic made configuration changes to the Gateway by assigning two coolers, including the cooler that malfunctioned on June 8, 2016, to additional LabAlert inputs. (*Id.* ¶ 59.) These changes triggered open sensor faults. (*Id.* ¶ 52.) On May 3, the SOC received alert signals from these two coolers at the Beaverton Facility and escalated the issue to Momirovic consistent with SOC's protocols. (*Id.* ¶¶ 51, 53.) Momirovic accessed the Gateway and determined that the alarm was caused by an open sensor fault triggered by his configuration changes made the previous day. (*Id.* ¶¶ 54, 58.) Momirovic resolved the alerts by bypassing the inputs. (*Id.* ¶¶ 52, 54–56.)

On May 15, 2016, the Gateway restarted after a power interruption and the SOC again received an alert. (*Id.* ¶ 60.) The SOC full cleared the alert the next day without receiving a restoral and without escalating to Momirovic, in violation of SOC's alert protocols. (*Id.* ¶¶ 61–62.) Critically, by full clearing the alert without

receiving a restoral, the Gateway remained in an alert state and was unable to send new alerts to MASterMind. (*Id.* ¶ 63.) FusionLive, however, continued to generate tickets for any temperature excursions. (*Id.*)

On June 8, 2016, a cooler at the Beaverton Facility malfunctioned causing the cooler's temperature to rise above its safe range. (*Id.* ¶ 64.) Although tickets were generated in FusionLive, the SOC was not alerted to the temperature excursion because it did not receive any alerts in MASterMind due to the improper full clear on May 16, 2016. (*Id.* ¶ 65; Dkt. 115 ¶ 64.) Because the SOC was not alerted to the issue, millions of dollars of specialty pharmaceuticals stored in the cooler were destroyed.

### F. Walgreens' Investigation

Momirovic was assigned to investigate why the SOC did not receive an alert in MASterMind on June 8. (Dkt. 162 ¶ 68.) Momirovic concluded that, during installation of the LabAlert System by CCV, the Gateway's configuration had not been saved to the Gateway's non-volatile memory, so the restart on May 15 caused the Gateway to revert to a previous configuration with open sensor faults and generate an alert in MASterMind. (*Id.* ¶ 70.) Because the SOC full cleared the alert on May 16 without receiving a restoral, the Gateway remained in an alert state and could not generate new alerts in MASterMind. (*Id.* ¶ 74.) Momirovic summarized his findings to Hal Friend, Walgreens' director of physical security:

> The events leading to the Beaverton [Facility] loss was a combination of both a hardware installation error by the vendor as well as a procedural failure in the [SOC] . . . Had the [May 15] alarm been handled differently with the proper procedures being followed to resolve the alarm, we would have received the alarm at the time of the Cooler failure.

(*Id.* ¶ 77.) On June 23, 2016, however, Walgreens' senior director of global security

8

services, Timothy Belka, instructed Friend to redraft the portion of Momirovic's report that mentions the SOC's failure to properly resolve the May 15 alarm because that "section is not clear . . . ." (*Id.* ¶ 80.) The final version of Friend's report omitted any reference to SOC's failure to follow proper protocol on May 15 and concluded that the cause of the June 8 event was the "failure of the last technician out to save the Gateway configuration." (*Id.* ¶ 82.) The last technician to make changes to the Gateway's configuration, according to Friend's report, was the CCV technician that removed the Winland System and installed the Bosch Panel on April 27, 2016. (*Id.*)

Panasonic and Comm-Works maintain that the CCV technician made no configuration changes to the Gateway on April 27. (*Id.* ¶¶ 41–42.) Walgreens "admits it cannot identify any configuration change made by the Comm-Works Technician on April 27, 2016," but says the "LabAlert System does not have a reliable log or audit trail of configuration changes to the Gateway, so Walgreens does not have a complete record of configuration changes." (*Id.* ¶ 43.)

## II. LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most

favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III.   DISCUSSION

### A.   Panasonic is Entitled to Summary Judgment

Walgreens brings three claims against Panasonic for breach of contract (Count I), negligence (Count II), and breach of warranty (Count III) arising out of Walgreens' June 8, 2016, loss of specialty pharmaceuticals at the Beaverton Facility. (Dkt. 1-1 ¶¶ 23–42.) Walgreens asserts that Panasonic, through its subcontractor, failed to properly install and configure LabAlert at the Beaverton Facility, which resulted in Walgreens' failure to receive an alarm when the cooler's temperature exceeded the specified range. (*Id.* ¶¶ 18–21.) Panasonic moves for summary judgment on all claims.

### i.   Walgreens' Negligence Claim

As the HSA between Panasonic and Walgreens explains, Illinois law governs any dispute arising out of relevant services. (Dkt. 1 at 42-43.). Illinois law sets out three elements of a cause of action for negligence: "(1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty; and (3) an injury proximately caused by the breach." *Wilfong v. L.J. Dodd Const.*, 930 N.E.2d 511, 519 (Ill. App. 2010). It is undisputed that Panasonic owed Walgreens an "ordinary standard of care" to properly install and configure LabAlert. (Dkt. 1-1 ¶ 33.) Panasonic contends that it is entitled to summary judgment because Walgreens has failed to present sufficient evidence to create a genuine dispute of fact regarding the latter two elements, breach and proximate causation. (Dkt. 140 at 6.) For the reasons that follow, the Court agrees with Panasonic.

### a.    Breach

The only breach alleged by Walgreens is that Panasonic "failed to properly install and/or configure the LabAlert systems." (Dkt. 1 ¶¶ 2, 34.) Specifically, Walgreens alleges that the CCV technician's failure to save a configuration change to the Gateway's non-volatile memory on April 27, 2016, caused the Gateway to revert to a prior configuration with open sensor faults when the Gateway restarted on May 15, thus preventing the SOC from receiving further alerts in MASterMind. (Dkt. 162 ¶ 82.) Panasonic argues that there is no evidence the technician accessed or made any configuration changes to the Gateway on April 27. (Dkt 140 at 4.)

The undisputed evidence supports Panasonic's position. As the CCV technician testified at his deposition, he "performed no configuration change on the [G]ateway on April 27, 2016, nor would [he] have [had] any reason to perform a configuration change on the [G]ateway." (Dkt. 121-5 at 20.) Eran Bernstein, the founder of LabAlert's manufacturer, also testified that none of the actions taken by the CCV technician on April 27, such as testing LabAlert with the Walgreens SOC, connecting the Gateway to the Bosch Panel, and uninstalling the Winland System, required any configuration changes to the Gateway. (Dkt. 130-2 at 30–31.) Walgreens argues that the Court should discount the testimony from the CCV technician and Bernstein because both individuals "have a clear incentive to see Panasonic's position prevail." (Dkt. 160 at 11.) Even if these individuals have such an incentive, the Court cannot discredit their testimony because "credibility determinations are inappropriate on summary judgment." *Walker v. Sheahan*, 526 F.3d 973, 980 (7th Cir. 2008).

Moreover, Walgreens' own employees, including Momirovic, Friend, and Jeff

Maurer, testified that they have "never been able to identify a specific configuration change that was made to the Gateway on April 27." (Dkt. 130-7 at 70; Dkt. 121-7 at 6; Dkt. 141-29 at 7–8.) According to Walgreens, the fact that "Walgreens cannot identify the specific change made by the contractor on April 27 is of no moment, because the LabAlert System does not retain a reliable record of configuration changes to the Gateway." (Dkt. 160 at 12.) It may be that the Gateway cannot yield a reliable record of changes, but this does not relieve Walgreens of its burden to produce evidence on this key fact. Simply put, Walgreens has not presented any evidence to support its theory that CCV technicians made changes to the Gateway on April 27 and cannot establish the essential element of breach.

### b.  Proximate Cause

Even if the evidence supported Walgreens' theory of breach, the CCV technician's alleged configuration changes on April 27 were not the proximate cause of Walgreens' injuries. A "defendant's conduct is the proximate cause of a plaintiff's injury if all events following that conduct, including any actions by the plaintiff, are its reasonably foreseeable results." *Suzik v. Sea-Land Corp.*, 89 F.3d 345, 348 (7th Cir. 1996) (citing *Bentley v. Saunemin Township*, 413 N.E.2d 1242, 1245 (Ill. 1980)). If an act "intervenes between the defendant's conduct and the plaintiff's injury" that is "not reasonably foreseeable," this act "breaks the causal chain that would establish the defendant's liability." *Id.* Walgreens took two actions after April 27 that prevented an alarm from generating on June 8, and neither of these actions were a foreseeable consequence of the CCV technician's work.

First, the undisputed evidence shows that Momirovic, not the CCV technician,

12

was the last person to make configuration changes to the Gateway before the May 15 restart. On May 2, Momirovic made configuration changes in the Gateway that triggered open sensor fault alarms. (Dkt. 162 ¶ 54.) In a May 4 email, Momirovic explained how he resolved the alarms: "[t]he temperature monitoring Gateway had a transmitter input enabled that should not have been," so "I logged into the Gateway and there was an input that wasn't bypassed so I bypassed it." (*Id.*) Friend testified as Walgreens' corporate designee that Momirovic, on May 3, was the last person to access the Gateway before the June 8 incident. (*Id.* ¶ 59.) Moreover, there is no evidence that Momirovic's configuration changes were necessitated by the CCV technician's work on April 27. When the Gateway lost power on May 15, therefore, it reverted to Momirovic's May 2 configuration. This intervening act—for which Panasonic was not responsible—broke the chain of causation between the CCV technician's changes and the subsequent destruction of the specialty pharmaceuticals.

Second, and of at least equal importance, the failure of Walgreens' own SOC caused Walgreens not to be alerted to the cooler's malfunction. Under the protocols developed by Momirovic, SOC personnel were supposed to identify the cause of any alarm, escalate the alarm to Momirovic if unable to determine its cause, and fully clear the alarm only once the condition causing the alarm was determined and the SOC received a restoral. (Dkt. 162 ¶¶ 47–49.) But SOC personnel did not follow this protocol when resolving the May 15 alarm. As Momirovic explained in his investigation report, "[b]y full clearing the alarm with no restoral, we were completely blind to the System and would not have received any more temperature alarms . . . .

13

SOC specialist should have partial cleared the alarm, created a ticket, and notified myself and Jeff Maurer on the issue per the SOC procedure." (*Id.* ¶ 75.) Later, at his deposition, Momirovic agreed with the conclusions made in his report, saying that "by full clearing without a restoral . . . the SOC representatives . . . violated the protocols." (*Id.* ¶ 78.) Friend testified that he agreed with Momirovic's assessment that, "had the alarm been handled differently with the proper procedures being followed to resolve the alarm, we would have received an alarm at the time of the cooler failure."[2] (*Id.*) Even if the Court assumes that the CCV technician saved changes to the Gateway on April 27, therefore, an alarm would still have been generated on June 8 if not for Walgreens' failure to follow its own alarm protocols.

Walgreens responds that it "can defeat summary judgment even if Walgreens could be found to bear some responsibility for the loss" because, "under Illinois' comparative fault regime, [] the Court cannot determine as a matter of law that Walgreens bears more than 50% responsibility for the loss." (Dkt. 160 at 14–15 (citing *Malen v. MTD Prods., Inc.*, 628 F.3d 296, 313 (7th Cir. 2010)).) Moreover, Walgreens says that "Panasonic was primarily responsible for the loss, because the SOC never should have been in the position of responding to the alarm on May 15" had LabAlert been installed correctly. (Dkt. 160 at 15.) Comparative fault "ordinarily is a question for the trier of fact and 'rarely' is decided as a matter of law." *Baez v. Target Corp.*, 80 F. Supp. 3d 862, 869 (N.D. Ill. 2015) (cleaned up). But the doctrine of comparative

---

[2] Though Friend removed any reference to SOC's failures in the final version of the investigative report, Friend's deposition testimony amply supports the theory that SOC's failure to follow alarm protocol prevented Walgreens from receiving an alarm on June 8.

fault is inapplicable because, as explained above, there is no evidence that Panasonic breached its duty. Panasonic does not, therefore, bear any responsibility for Walgreens' injury.

Walgreens has failed to present evidence on breach and proximate causation sufficient to warrant a trial before a reasonable jury. Accordingly, the Court grants summary judgment to Panasonic on Walgreens' negligence claim (Count II).

### ii.    Walgreens' Breach of Warranty Claim

Under Illinois law, the elements of a breach of warranty claim are (1) the existence of a warranty, (2) a breach of that warranty, and (3) proximate causation. *See Bluestein v. Upjohn Co.*, 430 N.E.2d 580, 586 (Ill. App. 1981); *see also* 810 ILCS 5/2-314, cmt. 13 ("In an action for breach of warranty," it is necessary to show "the existence of the warranty," that "the warranty was broken," and that the "breach of the warrant was the proximate cause of the loss."). Panasonic made two warranties to Walgreens in the HSA:

> Services Warranty. The Services and Support, and any consulting services that may be provided, will be performed in a diligent and professional manner, consistent with industry standards, by qualified workers experienced in performing the type of work that comprises the Services and Support . . .

> Products Warranty. Each of the Licensed Products (i) conforms to the Documentation; [and] (ii) is free from material defects, merchantable, and fit for the purposes provided in the Documentation . . .

(Dkt. 141-1 §§ 12.2(a) and (c).) Except for these two warranties, the HSA "explicitly disclaims all other warranties, express or implied, including the implied warranties of merchantability and fitness for a particular purpose." (*Id.* § 12.5.)

### a.   Services Warranty

Walgreens alleges that Panasonic breached the Services Warranty in two ways. First, Panasonic did not perform "in a diligent and professional manner, consistent with industry standards" because Panasonic failed "to correctly install and configure the LabAlert System, leading directly to the loss at Beaverton." (Dkt. 160 at 17.) Second, Panasonic did not use "qualified workers experienced in" installing and configuring the LabAlert System because CCV, which performed the installation, was "inexperienced" and "unfamiliar" with LabAlert. (*Id.* at 17–18.) Panasonic responds that Walgreens' arguments are "simply a restatement of Walgreens' claim that the LabAlert System was negligently installed and configured" and "must fail for the same reasons as its negligence claim": the lack of proximate causation. (Dkt. 140 at 21, 24.) Panasonic is correct.[3]

Walgreens' theory of causation between the alleged warranty breaches and its injury is that the CCV technician's configuration changes to the Gateway on April 27 prevented the Gateway from issuing an alarm when the cooler malfunctioned on June 8. (Dkt. 162 ¶ 88 (Panasonic breached an express warranty by failing to "properly [] install and configure the LabAlert system."); *Id.* ¶ 89 (Walgreens failed to properly install LabAlert when it failed "to save the configuration [on April 27 which] resulted

---

[3] Panasonic also argues that it did not breach the Services Warranty because Walgreens "has no evidence that Panasonic or Comm-Works improperly installed or configured the LabAlert System," and CCV was qualified to perform the installation because "CCV was an authorized installer for Comm-Works that had been vetted as a security vendor to do Walgreens' security work, and . . . CCV had performed jobs for Walgreens before installing the LabAlert System . . . and continued to work for Walgreens after the June 2016 event." (Dkt. 140 at 24–25.) The Court does not address Panasonic's breach arguments because Walgreens cannot prove proximate causation.

in what happened on May 15th and then what happened on June 8th."); *Id.* ¶ 89 (When asked whether any other facts support its warranty claim, Walgreens said that "the facts are the facts of the case, which we've discussed . . . we're [sic] back in April when the System was not installed and configured right and the loss that happened in June).)

Momirovic's May 2–3 configuration changes and the SOC's failure to follow proper protocol in addressing the May 15 alarm prevented Walgreens from receiving an alarm on June 8. Even assuming CCV was unqualified to install LabAlert and incorrectly configured the system, these breaches were not the proximate cause of Walgreens' injuries. Walgreens' breach of warranty claim premised upon the Services Warranty therefore fails.

### b. Products Warranty

Walgreens also argues that Panasonic breached the Products Warranty because the LabAlert System was not "fit for the purposes provided in the Documentation." (Dkt. 160 at 19 (citing Dkt. 141-1 § 12.2(c)).) Walgreens relies on an expert report from Jeffrey Zwirn, which purportedly identifies "several features and limitations that made the LabAlert System unreasonably risky to be deployed at the Beaverton facility[] and made a loss like the one that occurred foreseeable." (*Id.* at 19–20.) But Walgreens is advancing a "new product defect theory" that is unsupported by the facts pleaded in Walgreens' complaint and discovery responses (Dkt. 173 at 14–15), and Walgreens cannot defeat summary judgment by offering expert testimony on a summarily pleaded legal theory.

A party may neither "amend its pleadings by argument in opposition to

summary judgment nor introduce new theories of liability in opposition to summary judgment." *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017) (quoting *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014)). It is "factual allegations, not legal theories, that must be pleaded in a complaint," and a party cannot "add entirely new factual bases [at the summary judgment stage] not previously presented." *Id.*; *see Polycon Indus., Inc. v. R&B Plastics Mach., LLC*, 2022 WL 426582, at *6 (N.D. Ill. Feb. 10, 2022) (Plaintiff improperly altered its factual theory on summary judgment by focusing on allegedly fraudulent statements that the complaint "doesn't say a whiff about.").

Evidence offered to oppose summary judgment, including expert reports, that adds new factual theories may be excluded because it is "not relevant and, ergo, non-helpful." *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (citing Fed. R. Evid. 702). For example, in *McCarthy v. Target Corp.*, the district court excluded an expert opinion that concluded McCarthy slipped and fell in Target's store due to a protruding display case because McCarthy had "unequivocally . . . staked out one factual theory: she fell on a slippery liquid." 2012 WL 967853, at *6–9 (N.D. Ill. Mar. 19, 2012). McCarthy's expert opinion was contrary to the facts pleaded in her complaint, testified to in her deposition, and admitted to in response to Rule 36 requests, all of which supported a slippery-liquid theory. *Id.* at *8. As a result, the expert opinion was "not relevant or helpful to the claim as [plaintiff] has plead it." *Id.* at *9; *see also United States ex rel. Youn v. Sklar*, 273 F. Supp. 3d 889, 899–900 (N.D. Ill. 2017) (striking an exhibit from the summary judgment record because the exhibit "expands the number of false claims [made by defendant] from those discussed in

[plaintiff's] interrogatory answer," and plaintiff had "an affirmative duty to timely supplement that answer once he knew the original answer was incorrect or incomplete").

Moreover, a plaintiff cannot defeat summary judgment by relying on a summarily pleaded legal theory if the complaint and subsequent discovery admissions are devoid of factual allegations and evidence supporting that theory. For example, in *Silverman v. Motorola, Inc.*, the district court granted summary judgment for defendant on plaintiffs' insider-trading theory—even though plaintiffs' complaint alluded to insider trading—because the facts pleaded in the complaint did not put defendant "on notice that [p]laintiffs were pursuing an insider-trading theory." 772 F. Supp. 2d 923, 936 (N.D. Ill. 2011). Rather, the facts as alleged supported only the plaintiffs' fraud theory. *Id.* at 935–36.

Walgreens alleges that Panasonic "negligently fail[ed] to provide an alarm system that conformed to [Panasonic's] Documentation, and negligently fail[ed] to provide an alarm system that was fit for the purposes provided for in [Panasonic's] Documentation." (Dkt. 1-1 ¶¶ 41–42.) Walgreens' complaint, to be sure, at least alludes to Panasonic breaching the Products Warranty. But Walgreens' complaint does not allege any facts supporting this breach, such as the ways the LabAlert System failed to conform to or was unfit for the purposes in the Documentation. (*See id.* ¶¶ 1–38) On the contrary, the allegations focus solely on Panasonic's improper installation and configuration of the LabAlert System—or, in other words, a breach of the Services Warranty.

Walgreens, for instance, blames the loss of the specialty pharmaceuticals on

"not receiv[ing] an alarm notification via the LabAlert system" (*Id.* ¶ 18); alleges that Walgreens did not receive an alarm because Panasonic's "technician(s) and/or subcontractor failed to configure the LabAlert system properly" (*Id.* ¶ 19); and posits that "[h]ad the LabAlert monitoring system been installed properly, so as to ensure that Walgreens would receive an alarm notification, Walgreens . . . would have been able to prevent the damage to the stored specialty pharmaceuticals" (*Id.* ¶ 21). These allegations, which Walgreens incorporated into its breach of warranty claim (*Id.* ¶ 39), support only Walgreens' improper installation theory.

Walgreens stuck to its improper installation theory throughout discovery. In response to Panasonic's interrogatory asking Walgreens to detail the basis for its warranty claim, Walgreens said that "Panasonic's failure properly to install and configure the LabAlert system breached Panasonic's [Services Warranty]." (Dkt. 141 ¶ 88.) Friend, testifying as Walgreens' corporate designee, also confirmed that Walgreens' breach of warranty claim is premised on Panasonic's failure "to save the configuration [on April 27 which] resulted in what happened on May 15th and then what happened on June 8th." (Dkt. 162 ¶ 89.) When asked whether any other facts support Walgreens' warranty claim, Friend said that "the facts are the facts of the case, which we've discussed[;] . . . we're [sic] back in April when the System was not installed and configured right and the loss that happened in June." (*Id.*)

Throughout this litigation, Walgreens proceeded solely under its improper installation theory. Only now, in opposing summary judgment, does Walgreens (relying on Zwirn's expert report) assert that the LabAlert System was not "fit for the purposes provided in the Documentation." (Dkt. 160 at 19 (citing Dkt. 141-1

§ 12.2(c)).) By adding a new factual theory at the summary judgment stage, Walgreens is "attempting in effect to amend its complaint, and the district court has discretion to deny the *de facto* amendment and refuse to consider the new factual claims." *Chessie Logis. Co. v. Krinos Holds., Inc.*, 867 F.3d 852, 860 (7th Cir. 2017) (district court did not abuse its discretion by treating new factual theory as forfeited because the plaintiff "did not allege facts supporting [the new theory] in its complaint, and it had not otherwise signaled its pursuit of this theory until after discovery closed"). Because Walgreens has, until now, relied solely on its improper installation theory, Zwirn's expert report is not relevant to the only factual theory—improper installation—pleaded by Walgreens and is "insufficient to create a genuine dispute of material fact sufficient to defeat summary judgment." *McCarthy*, 2012 WL 967853, at *9 n.5.

Even if the Court were to consider Walgreens' Products Warranty theory, Zwirn's expert report is still not admissible. Panasonic warranted that LabAlert "(i) conforms to the *Documentation*; [and] (ii) is free from material defects, merchantable, and fit for the purposes provided in the *Documentation* . . . ." (Dkt. 141-1 § 12.2(c) (emphasis added).) "Documentation" means Panasonic's "user manuals, training materials, guides, product descriptions, technical manuals, product specifications, supporting materials and Updates describing" LabAlert. (*Id.* § 1.) Zwirn highlights "the multitude of deficiencies in the design of the LabAlert system," such as "its single output design; its single zone monitoring capabilities; its lack of battery backup; and its inability to send trouble signals." (Dkt. 162-3 at 3.) But Zwirn does not opine how these alleged design deficiencies failed to conform to

the "Documentation." (*See generally id.*) In fact, Zwirn fails to mention the "Documentation" even once throughout his report. (*Id.*) Zwirn also admitted at his deposition that the HSA's warranties "are outside the scope of my report and are not my opinions." (*See* 175-11 at 21.) Zwirn's report, therefore, is "not relevant" to the ultimate issue whether Panasonic breached the Products Warranty by failing to provide a product that conforms to and is fit for the purposes provided in the "Documentation." *See Daubert*, 509 U.S. at 591. Panasonic thus is entitled to summary judgment on Walgreens' breach of warranty claim (Count III).[4]

### iii. Walgreens' Breach of Contract Claim

Walgreens alleges that "Panasonic breached the HSA because it failed to indemnify Walgreens for the Beaverton loss." (Dkt. 161 at 25.) As the HSA's indemnification provision provides:

> [Panasonic] will indemnify . . . [Walgreens] from and against any and all Damages . . . arising out of or in connection with . . . bodily harm, death and/or loss and damage to real and tangible personal property *caused by the negligence or willful misconduct* of [Panasonic] or any [Panasonic] Affiliate or subcontractor . . . .

(Dkt. 141-1 § 14.1(a) (emphasis added).) Under the text of the indemnification provision, Panasonic's duty to indemnify extends only to damages caused by Panasonic's negligence. (Dkt. 140 at 27; Dkt. 161 at 25–26.) For the reasons previously discussed, Walgreens' injuries were not caused by Panasonic's negligence. Panasonic is thus entitled to summary judgment on Walgreens' breach of contract

---

[4] Panasonic also argues that Walgreens' breach of warranty claim fails because Walgreens failed to provide notice of Panasonic's alleged breaches within the 90-day warranty period. (Dkt. 140 at 25–26.) Because Walgreens' breach of warranty claim fails for the reasons already stated, the Court does not address this alternative argument.

claim (Count I).[5]

### B. Panasonic is Entitled to Partial Summary Judgment Against Comm-Works

After Walgreens sued Panasonic, Panasonic requested that Comm-Works defend and indemnify Panasonic under the indemnification provision contained in the Comm-Works Contract. (Dkt. 115-31 at 4.) Comm-Works rejected Panasonic's request because any relief awarded to Walgreens "would necessarily arise out of or be by reason of acts, duties, or obligations of parties other than Comm-Works or its subcontractors." (Dkt. 115-32 at 2.)

Panasonic then filed its third-party complaint against Comm-Works, arguing that "Comm-Works has a [contractual] duty to indemnify and defend [Panasonic] (including costs and reasonable attorneys' fees and expenses)" in Walgreens' suit against Panasonic. (Dkt. 43 ¶ 35.) Panasonic also brings a claim for common-law contribution, requesting that, "[i]n the event that [Panasonic] is found liable to Walgreens[,] . . . this Court enter judgment against Comm-Works in an amount commensurate with [Comm-Works' relative degree of fault.]"[6] (*Id.* ¶ 43.)

Comm-Works and Panasonic later filed cross-motions for summary judgment. Comm-Works seeks summary judgment on all claims. (Dkt. 114 at 1–3.) Panasonic responds that Comm–Works' summary judgment motion is premature as to Panasonic's claims for contractual indemnification for liability and contribution

---

[5] Because Walgreens' damages were not caused by Panasonic's negligence, the Court does not address Panasonic's alternative argument that the indemnification provision in the HSA "does not extend to first-party claims." (Dkt. 140 at 27–35.)

[6] On May 22, 2019, Judge Dow dismissed with prejudice Panasonic's third claim for implied indemnification. (Dkt. 80.)

because those claims are contingent upon a finding that Panasonic is liable to Walgreens. (Dkt. 158 at 8–10.) Separately, Panasonic requests summary judgment on its claim for contractual indemnification as to Comm-Works' duty to defend. (Dkt. 119.)

Panasonic's claims for indemnification for liability and contribution are moot. These claims are contingent upon finding Panasonic liable to Walgreens, but, as explained above, Panasonic is not liable. Panasonic, however, is entitled to summary judgment on its duty to defend claim, because the allegations in Walgreens' complaint triggered Comm-Works' duty to defend Panasonic.

### i. Contractual Indemnification

The Comm-Works Contract contains an indemnification provision, which requires Comm-Works to indemnify and defend Panasonic:

> [Comm-Works] agrees to indemnify and hold [Panasonic] harmless against any liability, damage or expense (including costs and reasonable attorney's fees and expenses) by reason or arising out of any acts, duties or obligations of [Comm-Works] or of any personnel, agents and/or representatives employed or otherwise engaged by [Comm-Works] to perform [Comm-Works'] obligations and duties under this Agreement and any [Statement of Work], and [Comm-Works] shall at the request of [Panasonic] assume the defense of any demand, claim, action, suit or proceeding brought against [Panasonic] by reason thereof and pay any and all damages assessed against or that are payable by [Panasonic] as the result of the disposition of any such demand, claim, action, suit or proceeding.

(Dkt. 115 ¶ 17.) Minnesota law governs the indemnification provision under the Comm-Works Contract's choice of law provision. (Dkt. 121-1 ¶ 8.)

### a. Duty to Indemnify

Under Minnesota law, a third-party claim for indemnification is "considered contingent upon the outcome of the original action." *Blomgren v. Marshall Mgmt.*

*Servs., Inc.*, 483 N.W.2d 504, 506 n.4 (Minn. Ct. App. 1992); *see Rice Lake Cont. Corp. v. Rust Env't and Infra., Inc.*, 616 N.W.2d 288, 291 (Minn. Ct. App. 2000) ("A right of indemnity arises when a party seeking indemnity has incurred liability."). Contingent claims, such as claims for third-party indemnification, "will not be ripe until liability has been established" and should be dismissed. *Med. Assur. Co., Inc. v. Hellman*, 610 F.3d 371, 375 (7th Cir. 2010); *see Jones v. Marriott Hotel Servs.*, 2008 WL 2940791, at *16–17 (N.D. Ill. July 25, 2008) ("Because Marriott's [third-party] contribution and indemnity claims are contingent upon a finding of liability on the part of Marriott in Plaintiff's underlying case that is no longer possible," Marriott's "indemnity and contribution claims" appear "to have [been] mooted."). For reasons previously discussed, Panasonic is not liable to Walgreens for the loss at the Beaverton Facility. Panasonic's claim for indemnification of liability, therefore, is dismissed as moot.

### b. Duty to Defend

Panasonic's duty to defend claim is ripe for adjudication because, unlike the duty to indemnify, the duty to defend "is triggered when the [third-party plaintiff] tenders notice of suit and opportunity to defend to the [third-party defendant]." *Remod. Dimens., Inc. v. Integ. Mut. Ins. Co.*, 819 N.W.2d 602, 616 (Minn. 2012). Panasonic provided notice of Walgreens' suit and requested that Comm-Works assume its defense. (Dkt. 115-31 at 4.) Comm-Works' duty to defend was triggered if Walgreens' claims, as alleged in the complaint, fall within the text of the indemnification provision. *See Meadowbrook, Inc. v. Tower Ins. Co., Inc.*, 559 N.W.2d 411, 415, 419 (Minn. 1997) (Whether the duty to defend exists "does not depend on

the merits of the claim asserted but on whether the allegations of the complaint against the [third-party plaintiff] state a cause of action" within "the relevant language in the [contract]."). The "duty to defend extends to every claim that 'arguably' falls within" the contract's text. *See Wooddale Builders, Inc. v. Md. Cas. Co.*, 722 N.W.2d 283, 302 (Minn. 2006).

Comm-Works' duty to defend is limited to claims "*arising out of* any acts . . . to perform [Comm-Works'] obligations and duties under [the Comm-Works Contract] and any [Statement of Work]." (Dkt. 115 ¶ 17 (emphasis added).) The phrase "arising out of" has "been broadly construed by Minnesota courts to 'mean causally connected with, not proximately caused by.' " *In re RFC and RESCAP Liquid. Tr. Action*, 332 F. Supp. 3d 1101, 1164 (D. Minn. 2018) (quoting *Faber v. Roelofs*, 250 N.W.2d 817, 822 (Minn. 1977) (cleaned up)). "Arising out of" generally means "originating from," "growing out of," or "flowing from." *Dougherty v. State Farm Mut. Ins. Co.*, 699 N.W.2d 741, 744 (Minn. 2005) (cleaned up). In *Kruis v. Target Corporation*, for example, the plaintiff sued Target after she slipped and fell on a clear liquid leaked by a refrigerator supplied by Hussman. *See* 2015 WL 1867790, at *1 (N.D. Ill. Apr. 22, 2015) (applying Minnesota law). Under the contract between Target and Hussman, Hussman had a duty to defend Target against any claims "arising out of or otherwise relating to the subject matter of the [contract]." *Id.* at *3. Although the subject matter of the contract was "the purchase of Hussmann freezers," the Plaintiff's "claims against Target '[arose] out of' the [purchase of freezers]" because, "but for" Target's purchase, the plaintiff would not have had any claim against Target. *Id.*

According to Comm-Works, the April 27 work was "wholly outside any

'obligations and duties under [the Comm-Works Contract or] any [Statement of Work]' " because the work "was performed on behalf of Walgreens, not Panasonic."[7] (Dkt. 114 at 15–16.) Comm-Works highlights that "Walgreens contacted Comm-Works directly regarding the April 27, 2016, work, without Panasonic's knowledge, and Comm-Works issued a new work order directly to Walgreens" (Dkt. 141 ¶ 40); "[i]nvoicing for the April 27 work went to Walgreens, not Panasonic" (Dkt. 153 ¶ 46); Panasonic admitted in its motion for summary judgment against Walgreens that the April 27 work "was not part of the scope of work for the installation of the LabAlert System" (Dkt. 141 ¶ 39); and, in that same motion, Panasonic denied "that the Comm-Works Technician was acting on Panasonic's behalf on April 27, 2016" (Dkt. 140 at 3 n.3). (Dkt. 152 at 7; Dkt. 115 ¶ 17.)

Panasonic responds that Walgreens' *allegation* that Comm-Works was acting as Panasonic's subcontractor on April 27—even if proven untrue—is "alone [] sufficient to trigger Comm-Works' duty to defend." (Dkt. 158 at 21–22.) Panasonic highlights that Walgreens "has repeatedly asserted that Comm-Works' work on April 27, 2016 arose out of or was by reason of" the Comm-Works Contract. (*Id.* at 22.) In its complaint, Walgreens alleges that "[Panasonic's] technician(s) and/or subcontractor failed to configure the LabAlert system properly [on April 27]," which

---

[7] In addition to arguing that the text of the indemnification provision does not cover the work performed on April 27, 2016, Comm-Works also asserts that it has no duty to defend Panasonic because Walgreens' claims against Panasonic are without merit. (*See* Dkt. 114 at 16–22 (Comm-Works arguing that the April 27 work was not the proximate cause of Walgreens' injury and that Walgreens was contributorily negligent).) The Court rejects Comm-Works' merits arguments because whether the duty to defend exists "does not depend on the merits of the claim asserted but on whether the allegations of the complaint" are within "the relevant language in the [contract]." *Meadowbrook*, 559 N.W.2d at 415, 419.

caused Walgreens to not receive an alarm when the cooler failed. (Dkt. 1-1 ¶ 19.) Walgreens further alleges that the April 27 work was necessary because the LabAlert System was improperly installed in February 2016, and that error "was corrected at Walgreens' request in April 2016" by "Panasonic or its subcontractor." (Dkt. 175 ¶ 14.) Panasonic also notes that Comm-Works characterized the work as "warranty work" and did not charge Walgreens, indicating that Comm-Works viewed the April 27 work as arising out of the initial installation governed by the Comm-Works Contract. (Dkt. 123-1 at 7.)

This evidence is susceptible to multiple interpretations: that Comm-Works issued a work order and invoice directly to Walgreens suggests that the April 27 work was outside the Comm-Works Contract, but Comm-Works also characterized the work as "warranty work" and did not charge Walgreens—which demonstrates that Comm-Works understood this work as part of the Comm-Works Contract. Whether Comm-Works was acting as Panasonic's subcontractor is a question of fact that goes to the merits of Walgreens' claims against Panasonic.[8] But this factual issue need not be resolved, because Comm-Works' duty to defend "does not depend on the merits of the claim asserted but on whether the *allegations* of the complaint" are encompassed by the indemnification provision. *Meadowbrook*, 559 N.W.2d at 419 (emphasis added).

As alleged in Walgreens' complaint, the April 27 work "aris[es] out of" the

---

[8] Though "Panasonic denies Walgreens' assertion that the Comm-Works Technician was acting on Panasonic's behalf on April 27, 2016," the Court agrees with Panasonic that "Walgreens' *allegations* that it was" are what is relevant to determining whether Comm-Works had a duty to defend. (Dkt. 140 at 3 n.3.)

Comm-Works Contract because, "but for" Comm-Works' improper initial LabAlert installation, Comm-Works would not have performed the latter work allegedly causing Walgreens' injuries. *Kruis*, 2015 WL 1867790, at *3. Because Comm-Works' April 27 work "arguably" arises out of the Comm-Works Contract, Comm-Works had a duty to defend Panasonic. *Wooddale*, 722 N.W.2d at 302. The Court grants summary judgment for Panasonic on its duty to defend claim.

Under Minnesota law, it is "well-settled that attorneys' fees and costs are recoverable when [a third-party defendant] breaches its duty to defend." *Nelson v. Am. Home Assurance Co.*, 2011 WL 6151519, at *5 (D. Minn. Dec. 12, 2011); *see Brown v. State Auto. & Cas. Underwriters*, 293 N.W.2d 822, 826 (Minn. 1980) ("The district court properly awarded the insured the costs and attorney's fees incurred in his defense of the [underlying] action because the insurer breached its duty to defend him."). Because the parties have not briefed the amount of fees and costs, the Court will make this determination later upon a motion by Panasonic. *See Bergen v. Grinnell Mut. Reinsurance Co.*, 946 F. Supp. 2d 867, 875 (D. Minn. 2013).

### ii.        Panasonic's Common Law Contribution Claim

Panasonic seeks contribution from Comm-Works if Panasonic is found liable to Walgreens. (*Id.* ¶ 43) Under Illinois law, "actions for indemnity and contribution are, by their very nature, contingent claims; each is contingent on the party seeking the relief first having been found liable in tort to the plaintiff in the underlying action." *Patch v. Glover*, 618 N.E.2d 583, 588 (Ill. App. Ct. 1993).[9] Because Panasonic is not

---

[9] When "there is no dispute over which state's law applies, the court will apply the substantive law of the state in which the federal court sits." *Kolchinsky v. W. Diary Transport,*

liable to Walgreens, Panasonic's contribution claim, which is contingent upon a finding of liability, is dismissed as moot. *Medical Assur.*, 610 F.3d at 375.

## IV.    CONCLUSION

Panasonic is granted summary judgment against Walgreens on all claims. Panasonic is also granted partial summary judgment against Comm-Works on its duty to defend claim. Panasonic's remaining claims against Comm-Works for contractual indemnification of liability and contribution are dismissed as moot.

SO ORDERED in No. 17-cv-02120.

Date: September 11, 2023

JOHN F. KNESS
United States District Judge

---

*LLC*, 949 F.3d 1010, 1013 n.2 (7th Cir. 2020). Here, the parties agree that Illinois law applies to Panasonic's contribution claim. Moreover, this is consistent with the rule that Illinois law applies when Illinois "has a *more* significant relationship with the occurrence and with the parties." *Townsend v. Sears, Roebuck and Co.*, 879 N.E.2d 893, 903 (Ill. 2007) (emphasis in original). Walgreens' injury occurred in Beaverton, Oregon. But Panasonic's contribution claim is contingent upon a finding of liability on Walgreens' claims, which are governed by Illinois law under the HSA's choice of law provision. Illinois thus has a "*more* significant relationship with the occurrence and with the parties." *Id.*